IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Sherwood Starr,                                    Case No. 3:19-CV-2934

        Plaintiff,

    v.                                          **ORDER**

Lyneal Wainwright *et al.*,

        Defendants.


This is a prisoner civil rights case under 28 U.S.C. § 1983. Plaintiff Chynna Starr
(formerly known as Sherwood Starr[1]) filed this action against multiple officers at the Marion
Correction Institution (MCI): Warden Lyneal Wainwright; Unit Manager Administrator Michell
Dunkle; Unit Manager Duane Ham; "John and Jane Does" Policymakers for the Ohio
Department of Rehabilitation and Corrections; and "John and Jane Does" Correctional Staff at
MCI.

In the Amended Complaint, Plaintiff first alleges that the Defendants violated her Eighth
Amendment right to be free from cruel and unusual punishment when they failed to protect her
from a known and serious risk of harm. (Doc. 3, ¶¶ 56–70). Second, Plaintiff alleges that the
Defendants violated her Fourteenth Amendment equal protection rights by impermissibly
discriminating against Plaintiff based on her sex and gender. (*Id.* ¶¶ 71–72).[2]

---

[1] At her October 14, 2021 deposition, Plaintiff stated her name as "Chynna Faith Logan." (Doc.
34, at 8:1–6). The Plaintiff's opposition brief, however, refers to "Chynna Starr," and I will do
the same.

[2] Plaintiff previously voluntarily dismissed her third cause of action, for common law negligence
against Defendants Wainwright, Dunkle, Ham, and Does #7–9. (Docs. 22–23). Plaintiff also sued
Joseph Hughey, Plaintiff's cellmate at MCI, but voluntarily dismissed this claim as well. (Doc.

**Background**

At all times relevant to this lawsuit, Plaintiff Chynna Starr was an inmate in the custody of the Ohio Department of Rehabilitation and Correction, serving an eleven-month sentence for theft. Plaintiff is a Black, transgender woman. She was born male but has been living as a woman for 26 years. (Doc. 34, 13:22–24).

Plaintiff physically presents as female. She takes prescription gender-affirming hormone therapy and has had breast and hip augmentation procedures to conform with her female gender identity. Plaintiff has male genitalia but plans to undergo complete gender reassignment surgery. (Doc. 34, at 15:7–21).

Plaintiff's prison sentence began on August 13, 2018 at the ODRC's Lorain Correctional Institution. (Doc. 34, at 19:9–10; Doc. 37, pgID 914). After about one month, ODRC transferred Plaintiff to the Lake Erie Correctional Institution (LAECI). Plaintiff remained there for about 35 days. (Doc. 34, at 19:13–16).

While at LAECI, Plaintiff spoke to prison staff about her facility placement. She testified that due to serious mental health and anxiety conditions, she had "a very serious issue with being in open dormitory-type settings." (*Id.* at 19:16–20:4). She requested placement in a prison block that was divided into cells. Based on this request, ODRC transferred her to MCI. (*Id.*).

### 1. Arrival at Marion Correctional Institution

Plaintiff arrived at MCI on October 26, 2018 to serve the remainder of her eleven-month sentence. (*Id.* at 20:5–8). MCI is a medium-security facility that houses both medium- and minimum-security inmates. (Doc. 36, at 54:1–15). It is a fully male prison that does not contain

---

39). As a result, only Plaintiff's constitutional claims under the Eighth and Fourteenth Amendments remain.

housing for women. MCI also does not have specific accommodations for LGBTQ individuals, including transgender persons. (Doc. 36, at 66:7–67:9).

Initially, prison staff assigned Plaintiff to "Eight-Dorm." (Doc. 34, at 32:9–18). Eight-Dorm is a dormitory-style prison housing facility within MCI. There are no walls between the bunk beds, and all inmates are in one common room, as opposed to behind concrete walls and cell doors. This allows prison officials to more easily track where the inmates are and what they are doing. (Doc. 36, at 94:10–23).

Shortly after her arrival and placement in Eight Dorm, prison staff, including Defendant Ham held a Prison Rape Elimination Act (PREA) assessment meeting with Plaintiff. (Doc. 36, at 47:11–48:21). At that meeting, Plaintiff told prison staff that she was uncomfortable in Eight-Dorm because of the lack of privacy for changing clothes and showering. (Doc. 34, at 36:1–37:2). Plaintiff testified that there were no issues regarding her physical safety in Eight-Dorm, but she wanted to be transferred to a different block. (*Id.*)

### 2.  Transfer to "H-Block"

In response to Plaintiff's request, prison staff moved Plaintiff to "H-Block," a part of the prison that was divided into cells, unlike the dormitories. Plaintiff initially felt comfortable in this new location; she shared a cell with only one person and had a special pass to shower privately. (*Id.* at 37:6–38:19).

However, shortly after coming to H-Block, she called ODRC's PREA hotline multiple times. (*Id.* at 41:15–49:8; Doc. 34-4). She complained that correctional officers and inmates at H-Block were verbally harassing her and giving her "weird or dirty looks." (Doc. 34, at 46:1–50:16). These incidents with the correction officers and inmates made Plaintiff feel uncomfortable. (*Id.* at 46:22–24).

### 3.  Transfer to "M-Block"

Plaintiff again was transferred—this time, to "M-Block"—on November 21, 2018 (Doc. 36, at 58:19–59:11). Defendant Michelle Dunkle made the decision to transfer Plaintiff, and Defendant Duane Ham was the unit manager overseeing M-Block. (*Id.* at 59:15–25). Sergeant Lucki, another correctional officer at M-Block, conducted the placement screening and assigned Plaintiff to a cell with Joseph Hughey (*Id.* at 60:12–61:2; 163:10–13). But other prison officials contradict this, testifying that Ham decided where to house Plaintiff. (Doc. 35, at 115:25–116:5).

M-Block is a privileged housing unit at MCI. (Doc. 36, at 103:14–18). Prisoners in M-Block had access to privileges that other prisoners did not. M-Block inmates had better job assignments and community service opportunities. The block also had an exclusive yard and exercise equipment. (*Id.* at 191:18–194:1).

Defendant Ham testified that it was the "premiere place to be" at MCI. (*Id.* at 61:3–24). There as a waiting list of over 200 inmates wanting to get in, and prisoners had to earn their spot. (*Id.* at 195:1–3). They must be "ticket-free" to get there, and they must remain on good behavior to maintain their place. (*Id.* at 134:21–25).

Plaintiff's transfer to M-Block was a departure from this long and selective process. She did not have to demonstrate a record of good behavior, did not have to go through the waiting list period, and did not need a lengthier sentence like the other inmates in M-Block. (Doc. 36, at 195:23–196:17). Also, her arrival displaced another inmate, whom prison officials relocated outside of M-Block to accommodate Plaintiff. (*Id.* at 68:9–69:1).

Joseph Hughey occupied the other bed in Plaintiff's cell.

### 4.   Inmate Joseph Hughey

Mr. Hughey is a white, cisgender man. (Doc. 43, pgID 955). He was serving a long sentence for convictions of robbery, aggravated burglary, and complicity to murder. (*Id.*).

He also had white supremacist affiliations in the past. (Doc. 36, at 81:3–14). Because of that, the prison had to evaluate his Security Threat Group ("STG") to determine if Hughey was still an active member of the white supremacist STG.

MCI's STG committee makes these determinations. Its purpose is to monitor and decide whether inmates should be classified and treated as an active member in a certain gang. (Doc. 35, at 55:8–17). The committee classifies inmates that have or had a gang affiliation on a three-tiered system. "Level-one" inmates are not active members of a gang and can be housed in a medium- or minimum-security facility. "Level two" inmates are active gang members, and the prison will quickly increase their STG level to the highest tier, "level three."

ODRC houses active gang members in higher security facilities. There are no active gang members at MCI because it is only a medium security facility. (Doc. 35, at 84:15–85:7; 105:14–25). And there especially are no active gang members in M-Block, a selective housing assignment based on good behavior incompatible with a gang affiliation. (*Id.*).

MCI's STG committee classified Hughey as an STG level one—meaning that he had a prior gang affiliation but was inactive. (*Id.* at 81:12–21).

MCI also keeps a disciplinary record for each inmate. The record contains any misconduct reports, segregation confinements, decisions by the Rules Infraction Board, and any violent history for the inmate. (Doc. 36, at 105:5–10). The parties did not submit Hughey's disciplinary records with their motion briefing.

Defendant Ham testified that he had never seen Hughey act violently toward anyone. He also does not recall Hughey ever getting into a fight or having to place Hughey in the segregation block. (*Id.* at 104:20–105:2).

Michelle Turner, the PREA coordinator at MCI, testified that she was not aware of Hughey having any disciplinary history "for years, and years, and years." (Doc. 35, at 129:10–130:11). She also testified that Hughey did not have a history of sexual violence against anyone. If he did, he would not have been housed in a cell block; he would have been housed in a dormitory where officers can keep a closer eye on all inmates. (*Id.*)

### 5.  Plaintiff's Cell Assignment with Hughey

Plaintiff immediately objected to the cell assignment. Her first night in M-Block, Plaintiff complained to Defendant Ham that she was upset she was placed there. (Doc. 36, at 65:6–18). Ham asked if Plaintiff feared for her safety, but Plaintiff said she did not. (*Id.*). Plaintiff instead wanted to be transferred out of M-Block and placed in J-Block.

J-Block is another cell block at MCI. Plaintiff believed that J-Block was specifically reserved for LGBTQ inmates. (Doc. 42, pgID 331).

At the time, J-Block had a large LGBTQ population, but that was not by design. MCI did not offer a transgender unit. Unknown prison officials decided to reduce the LGBTQ population in that cell block. (Doc. 36, at 66:7–67:15). Defendant Ham testified that is why Defendant Dunkle transferred Plaintiff to M-Block and refused to transfer her to J-Block. (*Id.*).

Plaintiff's complaints about Hughey continued. She submitted three written grievances regarding her cell assignment. In her first grievance, Plaintiff complained that she should not have been placed in a cell with a white supremacist and murder convict. (Doc. 42, pgID 342).

In her second grievance, Plaintiff again complained about her cell block placement, and wrote that Hughey "speaks a lot [about] murder, and his membership to The White Supremacist." Plaintiff also wrote that Hughey asked her "why would they put me in a cell with [s]omething so feminine and I haven't been around a woman in 28 years." (*Id.*, pgID 340). Plaintiff restated her request to move to J-Block, where she believed she would be more comfortable. (*Id.*).

In the third grievance, Plaintiff said her complaint was "specifically intended to address Warden Wainwright with the refusal I have been met with to move to J Block." (*Id.*, pgID 331). She wrote that she was having "serious issues" with Hughey, including Hughey talking about murder and telling her that he wanted her to become close with his friends. (*Id.*). She stated that she was extremely uncomfortable with Hughey and that it was affecting her mental health and anxiety. (*Id.*).

Defendants Ham and Wainwright responded to Plaintiff's grievances. Ham told her that she would need to put in a bed move request if she was not getting along with Hughey. Ham also told her that if she felt unsafe, she should tell an officer. (*Id.*, pgID 341). Wainwright told Plaintiff that J-Block is not dedicated LGBTQ housing and that inmates do not get to pick their housing assignments. (*Id.*, pgID 331).

At no point did Plaintiff write in her grievances that she felt unsafe or that Hughey was threatening her. Plaintiff testified that Hughey never made any direct verbal threats to her. (Doc. 34, at 82:15–22). Instead, Plaintiff said Hughey would make a "show of strength" by flexing his muscles and rubbing his tattoos with white supremacist markings. (*Id.*).

Around this time, Plaintiff also wrote a letter to the Ohio governor. In it, Plaintiff complained of "multiple violations of hate and inappropriate sexually oriented comments" made

7

by correctional staff and inmates. (Doc. 34-4, pgID 403). She also complained about being assigned to "a cell with a white supremacist . . . doing 32–life for multiple murders." (*Id.*, pgID 405). Plaintiff said she requested that her attorney file a lawsuit for the "deliberate and intentional [actions of correctional staff], and the origins of, motives of deeply established 'hate' as defined under federal law." (*Id.*, pgID 406).

### 6.  The December 5, 2018 PREA Assessment Meeting

In response to this letter, Michelle Turner scheduled a second PREA assessment to address Plaintiff's concerns. The meeting happened on December 5, 2018, just two weeks after Plaintiff's arrival in M-Block. Plaintiff, Defendant Dunkle, Michelle Turner, and other prison staff attended. (Doc. 34-3, pgID 376–77).

> At the meeting, Plaintiff wrote a statement on a form labeled "Voluntary Statement":
>
> On 12/5/18, I met with PREA Past Panel and after an adjustment period in Maple Unit, M Block, I realize the move facilitated by [the Chief Unit Manager], Ms. Dunkle, and Dr. Watson, were accommodating and in the best interest of my safety.
>
> The PREA Past meeting had on 12/5/18, was informative, and insightful, and I was verbal in stating my comfort level, with my cell mate, [Officer] Young specifically, even in my interactions with Michelle Turner, The [Operational Compliance Manager] of MCI.
>
> The emotional correspondences addressed to multiple places, persons, and office were written prior to the acclamation period I have had in M Block. M Block, overall, is honestly a safe, healthy environment and appropriate to my lifestyle.
>
> My cell mate and I have been understanding in each others space, and respect level.

(Doc. 34-6). The PREA assessment report then concluded that Plaintiff has adjusted to living in M-Block, that she reported feeling safe, and that she should therefore remain in the block. (Doc. 34-3).

8

Plaintiff testified at her deposition that prison staff forced her to write this statement under duress. Plaintiff said that Ms. Turner and Defendant Dunkle told her she had to write the statement or they would place her back in an open dormitory facility so she could be more closely monitored. (Doc. 34, at 73:20–75:7). Plaintiff did not want to go back to an open dormitory because she would not have privacy, and she stated she had "a history of anxiety and very severe mental health issue in an open dorm." (*Id.* at 74:5–17). So Plaintiff picked the option to write out the statement and stay in M-Block. (*Id.* at 77:7–14).

Plaintiff authored several statements after this one. On December 6, 2018, Plaintiff referenced the PREA assessment meeting in a grievance response. Plaintiff said, "As indicated per the conversation had with . . . [the] PREA Past team, my issues are not with Officer Young. My issues are with Officer Garnow . . . ."[3] (Doc. 34-2, pgID 334).

On December 12, 2018, Plaintiff submitted a grievance system entry saying that she wanted to withdraw a prior grievance against Ms. Turner. Plaintiff wrote:

> [P]erhaps I have been unfair to Michelle Turner, blaming her for the PREA
> [c]ompliance failures, and in my thinking, perhaps I have been unfair to her. In
> my attempt to fairly and honestly file grievance, I withdrew this Grievance and
> another against Michelle Turner, because they were written as [I] was
> experiencing serious issue of hate, discrimination, and prejudices . . . .

(Doc. 34-2, pgID 337).

On December 20, 2018, while making her own grievance appeal, Plaintiff expressly acknowledged her voluntary statement made during the PREA assessment meeting:

> I am appealing this Grievance strictly to maintain a paper trail of events that have
> pertained tom custody at MCI. While it seems that most of the issues [have]
> subsided, and (at current), I am being treated like every other inmate at MCI.
>
> I signed a voluntary statement at my PREA Past meeting, indicating that the bed
> move that moved me from H Block, Hickory Unit, to M Block, Maple Unit was

---

[3] Two officers that allegedly made offensive remarks to Plaintiff in an unrelated incident.

m[a]de in my best interest. I signed the statement because corresponden[c]e letters I wrote to Governor Kasich, and Amanda Moon, were used against me with an attempt to move me to a dorm. This move was despite the finding of the previous PREA Past meetings that determined I was okay to b[e] housed in a cell. I was moved into a cell[] with a white supremacist[], and while at first I had serious concerns such bed move was v[i]ndictive and done in malice, it was explained to me, by Dr. Watson, and Chief of Unit Management that it really was coincidental. I felt comfortable in believing this, and even apologized to Michelle Turner, for blaming her for all the things that have happened to me since I arrived at MCI. I even decided to withdraw my Grievances against her.

[. . .]

I lost interest in the bed move upon signing the voluntary statement to the PREA Past members, and indicated, I was comfortable in M Block, and that my cellie and I had resolved our differences. Since signing th[a]t statement, [Inspector] Smith, has used his suggestion to answer every grievance and to insinuate I did all this for a bed move.

(*Id.*, pgID 332–33).

The next day, in a new grievance against the inspector that investigates grievances,

Plaintiff again adopted her December 5, 2018 statement:

On 12/5/18, I signed a statement, indicating that Chief of Unit Management, Ms. Dunkle, and head of Mental Health, Dr. Watson facilitated a move that was made in my best interest, with my safety in mind. I had previously filed a grievance on the bed move, believing it was made in malice. As the specific circumstances of the move were made clear to me at The PREA Past meeting on 12/5/18, I sign[e]d away any thought, desire or motive to move, stating I was perfe[c]tly content with where I was, and the circumstances, and people that were inv[o]lved with the move. I withdrew my grievances against Michelle Turner, . . . I apologized to her for blaming her for everything that happened to me, and I did not pursue the Grievances that were written with regard to my inmate moves at MCI.

(*Id.*, pgID 326).

The day after that, on December 22, 2018, Plaintiff wrote to clarify which grievances she

withdrew. She again acknowledged the December 5, 2018 statement:

On 12/5/18, a second PREA Past meeting was held to remove me from a cell block, using my words of concern against me, ignoring my medical benefits of being housed in a cell. As such I signed a statement stating I was (at that time) in a decent place with my cellie, and the unit I was on was very appropriate.

10

(*Id.*, pgID 356–57) (emphasis removed).

### 7.  The Alleged Assaults

Plaintiff testified that on December 22, 2018, Hughey sexually assaulted her by forcing her to perform oral sex on him.[4] (Doc. 34, at 83:1–8). Plaintiff testified that Hughey sexually assaulted her again on January 2, 2019, by physically threatening her and forcing her to perform multiple sex acts with him. (*Id.* at 87:15–89:6).

Plaintiff did not tell anyone at the prison, including any of the Defendants, about Hughey's conduct until she reported the assaults to her cell block officer on January 2, 2018. (*Id.* at 90:12–24). Prison staff immediately escorted Plaintiff to the medical unit where medical staff examined her. (*Id.* at 91:18–92:5). Prison staff then took Plaintiff to an outside hospital to be examined. (*Id.* at 93:18–24).

Upon returning to MCI later that same day, prison staff removed Plaintiff from M-Block and placed her in an open dormitory, about three to five feet away from the dormitory officer's desk. (*Id.* at 96:17–97:7; 99:21–100:9).

Plaintiff requested a transfer to the segregation block because inmates in the dormitory were verbally harassing her. (*Id.* at 100:14–23). Plaintiff testified that Defendant Ham and Sergeant Lucki transferred her to segregation the next day, January 3, 2019, for disrespecting an officer. (*Id.* at 101:1–16).

---

[4] Plaintiff testified that Hughey assaulted her at about 3:45 a.m. (Doc. 34, at 83:1–8). Plaintiff wrote her December 22, 2018 grievance form entry at about 6:00 p.m., just hours after the alleged assault. (Doc. 34-2, pgID 356). However, Plaintiff said she was too afraid at the time to report the assault to prison staff. (Doc. 34, at 83:18–24). She testified that she did report it to her attorney immediately, but Plaintiff is unaware if her attorney subsequently reported the sexual assault to the authorities. (*Id.* at 84:14 – 85:19).

The prison investigated Plaintiff's sexual assault claims. (Doc. 34-7). The investigator's report concluded that Plaintiff's allegations of sexual abuse were unfounded. (*Id.*). Plaintiff received a copy of the report and refused to sign it. (Doc. 34, at 111:2–7).

MCI's inmate disciplinary committee, the Rules Infraction Board ("RIB"), also concluded that Plaintiff violated prison rules. The RIB's report said that Plaintiff violated the rules by having "consensual physical contact with Inmate Hughey . . . and then made false statements about the contact." (Doc. 34-5, pgID 412). Plaintiff appealed this decision, but the warden affirmed the RIB's determination. (*Id.*, pgID 414; Doc. 34, at 115:1–5).

ODRC transferred Plaintiff to North Central Correctional Institution on January 22, 2019, where she served the remainder of her sentence. (Doc. 34, at 115:14–21; Doc. 43, pgID 959).

### Legal Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. The movant need not produce evidence to show this absence; instead, it may discharge its burden by pointing out to me an absence of evidence to support the nonmovant's case. *Id.* at 325.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex, supra,* 477 U.S. at 324.

I accept the nonmovant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But the nonmovant must show that there is sufficient evidence in his favor that would allow a jury to find in his favor. *Anderson, supra*, 477 U.S. at 249.

"If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249–50 (internal citation omitted). "The mere existence of a scintilla of evidence" in plaintiff's favor is insufficient. *Id.* at 252. My task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020).

## Discussion

Remaining in the Amended Complaint are Counts I and II, claims brought under 28 U.S.C. § 1983. In Count II, Plaintiff claims that the Defendants violated her Fourteenth Amendment equal protection rights by "impermissibly discriminating against Plaintiff based on her sex and gender. Defendants argue that there is no evidence that Plaintiff was denied a benefit afforded to other inmates. Defendants also argue that, to the extent prison official treated Plaintiff differently than other inmates, they did it at Plaintiff's repeated requests for special accommodations.

Plaintiff offers no evidence of a disputed fact regarding this claim. *See Anderson*, 477 U.S. at 250. Additionally, Plaintiff has waived argument by not addressing her Fourteenth Amendment claim at all in her opposition brief. *See Wood v. U.S. Bank Nat'l Ass'n*, 2019 WL 1255229, at *3 (N.D. Ohio Mar. 19, 2019) (Adams, J.) ("A party waives opposition to an argument by failing to address it in her responsive brief.").

13

I therefore do not consider the merits of Plaintiff's Fourteenth Amendment claim, and I grant summary judgment on Count II. *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because [Plaintiff] failed to address it in . . . his response to the summary judgment motion . . . .").

This leaves only Count I, Plaintiff's claim that the Defendants failed to protect her from Hughey's alleged sexual assaults, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.[5]

I apply the "deliberate indifference" standard to failure-to-protect claims. *Zakora v. Chrisman*, 44 F.4th 452, 468 (6th Cir. 2022). Under that standard, a Plaintiff must prove both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). She must show that (1) objectively, she was "incarcerated under conditions posing a substantial risk of serious harm, and (2) the official acted with 'deliberate indifference' to inmate safety, meaning the official was subjectively aware of the risk and fail[ed] to take reasonable measures to abate it." *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (internal citation and quotation marks omitted).

### 1. Objectively Substantial Risk of Serious Harm

---

[5] Plaintiff sued Defendants in their individual *and official* capacities. (Doc. 3). Courts treat official capacity claims as claims against the government entity itself—here, ODRC. *See Schoonover v. Rogers*, 2022 WL 12258998, at *10 (6th Cir. Oct. 21, 2022). Section 1983 liability against ODRC must be based on an ODRC "policy or custom" that causes the constitutional injury. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978). Plaintiff has not offered evidence of a policy or custom. I therefore grant summary judgment on the official-capacity claims.

14

To satisfy the objective component, an inmate must provide sufficient evidence to show that the risk of harm was "objectively sufficiently serious." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011). "Federal courts have long held that sexual abuse is sufficiently serious to violate the Eighth Amendment." *Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087, 1095 (6th Cir. 2019) (discussing a correctional officer's sexual abuse of an inmate).

Plaintiff has presented sufficient evidence to show that she belongs to a class of prisoners vulnerable to assault. She is a transgender woman, and as such, she generally faces a heightened risk of violence due to her gender identity. *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 933 (S.D. Ohio 2020) (collecting cases and sources).

The record PREA assessment forms also consider transgender inmates at risk for abuse. The forms, in determining the victimization potential for the inmate, ask whether the inmate "report[s] to be, or report[s] that he or she is perceived to be transgender . . . ." (Doc. 34-3, pgID 368). If the inmate is transgender, that factor weighs in favor of classification as a potential sexual abuse victim.

Plaintiff reported in her PREA assessments that she was transgender, and MCI initially classified plaintiff as a potential victim. MCI also instituted an "accommodation plan" not to house Plaintiff "in close proximity to an [abuser] or [potential abuser]," as determined by the PREA inmate classifications. (*Id.*, pgID 371).

Plaintiff's victimization potential is not the end of the objective analysis, however. A vulnerable plaintiff must also be "incarcerated under conditions posing a substantial risk of serious harm" given her vulnerability. *See Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021).

Plaintiff's cited cases support this. In *Bishop v. Hackel*, the plaintiff inmate was vulnerable because he was "young, small, suffer[ed] from severe mental illness, and exhibit[ed] a

15

lack of full mental functioning." *Supra,* 636 F.3d at 766. The plaintiff was then placed in a cell with an "older, stronger, and predatory inmate" who was "incarcerated for violent felonies *including sexual assault*." *Id.* (emphasis added). The Sixth Circuit affirmed the district court's conclusion that placement in a cell with a predatory, sexually violent inmate put plaintiff in "grave danger." *Id.*

In *Greene v. Bowles*, the plaintiff was a medium-security inmate and a transgender female that was placed in the prison protective custody unit to protect her from other inmates. 361 F.3d 290, 292 (6th Cir. 2004). At the time, the prison placed another inmate in the same unit to protect him from retaliation for testifying against fellow prisoners. *Id.* The prison classified this inmate as a "maximum-security prisoner," who himself had a "long history of assaults on other inmates." *Id.* He had a "lengthy prison misconduct record, including . . . two convictions for felonious assault arising out of [a] prison riot" and "a long institutional history of being a disruptive, violent inmate . . . ." *Id.* at 294–95. The Sixth Circuit affirmed the summary judgment denial "because of [plaintiff's] status as a vulnerable inmate *and because of [the assaulter's] status as a predatory inmate*." *Id.* at 295 (emphasis added).

In line with these cases, Plaintiff Starr has not submitted sufficient evidence to show that Joseph Hughey posed an objectively substantial risk to her safety. Hughey was serving a sentence for complicity to murder. He was also a past member of a white nationalist STG, an association whose depravity goes far beyond the typical pecuniary motives of street gangs and into the terrorizing of our society and fellow Americans.

However, Hughey has been a resident at MCI for a long time. And in the time leading up to the alleged assaults, he had not shown any of the propensities of his criminal past. Quite the opposite, the unrebutted evidence shows that Hughey earned his placement in M-Block through a

16

long history of good behavior, a discipline-free record, and the relinquishment of his past gang affiliations. *See Reedy v. West*, 988 F.3d 907, 913 (6th Cir. 2021) ("Prior to the assault, there is no evidence that [the cellmate] ever harmed [plaintiff]. Nor is there evidence [the cellmate] had a violent criminal history or was ever involved in a physical altercation in prison.").

Were this not so, he would never have made it into the privileged housing block at MCI. If Hughey were still an active member of an STG, he would not even be allowed in the medium-security MCI facility, let alone keep his bed in M-Block. And if Hughey had a history of sexual violence, he never would have been in a cell alone with another inmate. Neither scenario is the case here.

Joseph Hughey is certainly no boy scout. But at the same time, I cannot conclude on this record that there is a triable issue of fact regarding his objective propensity or risk of violence to other prisoners. Plaintiff has not presented any of Hughey's disciplinary records or other evidence that would allow a reasonable jury to conclude he was an active threat to Plaintiff and other inmates. Plaintiff testified that Hughey never threatened her—only that he would "flex his muscles" and make her feel "extremely uncomfortable." *See Farmer, supra*, 511 U.S. at 832 ("The Constitution does not mandate comfortable prisons") (internal quotation marks omitted).

Plaintiff's one reed of evidence—that Hughey, at some indeterminate time in the past, was an active member of an STG who was convicted of complicity in a violent crime—is too slender. *See Anderson, supra*, 477 U.S. at 252. Plaintiff has failed to put forth sufficient evidence to show that she was exposed to a substantial risk of serious harm.

## 2. Subjective Awareness of and Indifference to the Risk

The second component of the analysis depends on the first. A defendant is only liable where he or she is aware of a substantial risk of serious harm and failed to take reasonable

measures to protect the inmate. *Reedy, supra*, 988 F.3d at 912. In other words, if there is no objectively substantial risk, then there is no constitutionally problematic harm for a defendant to subjectively know of and disregard.

I have concluded that there is no issue of triable fact on the objective prong. But even assuming that Hughey did pose a substantial risk of serious harm to Plaintiff, Plaintiff has not shown that any of the Defendants were aware of and disregarded that risk.

To prove the subjective element of a deliberate indifference claim, a Plaintiff must show that the individual government officials "(1) were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) actually drew the inference; and (3) consciously disregarded the risk. *Westmoreland v. Butler Cnty., Kentucky*, 29 F.4th 721, 726–27 (6th Cir. 2022).

This requires more than a showing of negligence, akin to criminal recklessness. *Farmer, supra*, 511 U.S. at 839–40; *see also Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (discussing the same in a case for deliberate indifference to a serious medical need). Plaintiff must show that Defendants knew of and disregarded "an excessive risk to inmate health or safety." *Farmer, supra*, 511 U.S. at 837; *see also Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). A plaintiff can prove subjective knowledge through circumstantial facts, that "the defendant official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 n.7 (6th Cir. 2002) (quoting *Farmer, supra*, 511 U.S. at 842–43).

I must analyze each Defendant's subjective knowledge and conduct individually. *Bishop, supra*, 636 F.3d at 767. Common to all Defendants, however, Plaintiff testified that she never told any of them about the alleged December 22, 2018 sexual assault until her January 2, 2019

18

report of the second alleged assault. Therefore, a reasonable jury could not conclude that Defendants should have taken reasonable measures to protect Plaintiff in response to the first assault. The Defendants did not know that it happened until later.

Instead, Defendants' subjective knowledge here must be based on what they each knew about Hughey and Plaintiff's actual complaints regarding him.[6]

### a. Duane Ham

Defendant Ham was the unit manager for M-Block. Plaintiff did not have any interaction with him before her transfer there on November 21, 2018. Plaintiff claims that Ham was aware of the substantial risk Hughey posed to her and that he did nothing to abate it. (Doc. 43, pgID 968–69).

Plaintiff testified that she made several complaints to Ham, but she never told him that Hughey threatened her or that she felt unsafe. She told Ham that Hughey talked a lot about murder, knew information about her, and made several uncomfortable comments to her.

Plaintiff also testified that she documented her "safety concerns" to Ham in her grievance to him. (Doc. 34, at 139:11–21). But Plaintiff only said that she felt extremely uncomfortable and repeated multiple times her desire to be moved to the housing block of her choice with the cell mate of her choice.

Plaintiff offers no evidence that Ham knew of any propensity for violence regarding Hughey. Defendant Ham's unrebutted testimony is that Hughey did not have disciplinary issues,

---

[6] Plaintiff also sued "John and Jane Does #1–9." (Doc. 3). Discovery has closed. Plaintiff has not identified or served these unknown Defendants, and she had ample time to do so during the litigation. I dismiss Doe Defendants #1 – 9 without prejudice. *See Saal v. City of Wooster*, 2020 WL 2733735, at *4 n.4 (N.D. Ohio May 26, 2020) (Lioi, J.); *Bays v. Paramount's Kings Island*, 2008 WL 11452040, at *5 (S.D. Ohio Mar. 25, 2008).

did not get into trouble, and worked his way into his privileged spot in M-Block through good behavior. *Reedy v. West*, 988 F.3d 907, 916 (6th Cir. 2021) ("[T]here is no evidence that [defendant] was aware of any information suggesting that Hensley had a propensity for violence, had assaulted anyone, or was disciplined in prison."); *see also Schoonover v. Rogers*, 2022 WL 12258998, at *7 (6th Cir. Oct. 21, 2022) ("[T]hough [a prison official] testified that [the cellmate] was a troublesome 'frequent flyer' at the Jail, neither he nor the other officers indicated that they were aware, at the time of the attack, that [the cellmate] was particularly violent, let alone that he targeted sex offenders.").

There is no evidence that Ham knew of a substantial risk that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *Reedy, supra*, 988 F.3d at 916 (citing *Farmer, supra*, 511 U.S. at 842). In *Reedy*, the inmate plaintiff testified that he made some vague statements to the defendant about fearing for his safety and about his cellmate threatening him. *Id.* at 914. The cellmate also told defendant that they needed to move plaintiff out of his cell or "whatever happens . . . is going to be onto [you]." *Id.* at 915.

The court affirmed summary judgment on the failure-to-protect claim, reasoning that the defendant did not subjectively perceive the cellmate's statements as threats. *Id.* "[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* (quoting *Varmado-El v. Martin*, 52 F. App'x 764, 766 (6th Cir. 2002).

This reasoning is even more apt here because plaintiff never complained that Hughey threatened her. Instead, she testified that Hughey never made any direct threats toward her.

Her deposition characterization of her complaints as "safety concerns" are not backed up by the evidence. A reasonable jury could not, based on these vague statements about discomfort,

conclude that Ham subjectively perceived "an excessive risk to [her] health or safety." *Farmer, supra*, 511 U.S. at 837; *Reedy*, 988 F.3d at 914 ("[T]his conclusory evidence does not suffice. The purpose of summary judgment is to determine whether a material fact dispute exists for the jury to resolve, not to replace conclusory allegations of the complaint or answer with conclusory allegations [in a] deposition.").

Therefore, Plaintiff has not shown a genuine issue of material fact regarding Defendant Ham's subjective knowledge of a substantial risk of serious harm.

### b. Michell Dunkle

Defendant Michell Dunkle was MCI's unit manager administrator and Defendant Ham's supervisor. She was responsible for Plaintiff's transfer to M-Block, and she also attended the December 5, 2018 PREA assessment meeting. Plaintiff claims Dunkle knew after the PREA meeting that Hughey was a substantial threat to her and that Dunkle did not separate Hughey from Plaintiff. (Doc. 43, pgID 969).

Plaintiff did not know and had never met Defendant Dunkle until the PREA meeting. (Doc. 34, at 47:22–24). Plaintiff's opposition brief argues that Dunkle knew that Plaintiff was unsafe with Hughey, but Plaintiff does not point to any specific evidence showing that.

Plaintiff also argues that Dunkle was responsible for Plaintiff's transfer to M-Block, where she was assigned to a cell with Hughey. It was Plaintiff's request, however, to be transferred out of a dormitory and into a cellblock. It is entirely unclear how a jury could conclude that Dunkle was deliberately indifferent to Plaintiff's health and safety by fulfilling Plaintiff's own request for safer accommodations.

At the meeting, Plaintiff's own written statement shows that Dunkle and others explained to her that the move to M-Block was done for her safety. They also explained that Plaintiff

21

would be safest in M-Block, surrounded by inmates with demonstrated records of good behavior. Plaintiff wrote that she understood the move was done in the interest of her safety and that she and Hughey "have been understanding in each others space, and respect level."

Plaintiff testified at her deposition that Dunkle forced her to write the statement against her will and under duress. This cannot be the case, and no reasonable juror could so find.

Plaintiff wrote multiple statements *after* her PREA meeting statement that adopted almost exactly what she wrote on December 5, 2018. She wrote about her PREA meeting: "I sign[e]d away any thought, desire or motive to move, stating I was perfe[c]tly content with where I was." In another grievance, she wrote, "I lost interest in the bed move upon signing the voluntary statement to the PREA Past members, and indicated, I was comfortable in M Block, and that my cellie and I had resolved our differences."

Plaintiff does not claim she was forced to make these unsolicited disclosures under duress. Based on Plaintiff's subsequent adoption of the PREA meeting statement's substance, a reasonable jury could not conclude that prison staff forced her to make those statements against her will.

The record only shows that Defendant Dunkle knew that Plaintiff complained about being in a cell with Hughey and that Plaintiff felt safe in M-Block once Dunkle explained the transfer. Plaintiff offers no evidence that Dunkle knew of an actual substantial risk to Plaintiff's safety.

Therefore, Plaintiff has not shown a genuine issue of material fact regarding Defendant Dunkle's subjective knowledge.

### c.  Lyneal Wainwright

Defendant Lyneal Wainwright was the MCI warden. Plaintiff claims that she told Wainwright her "specific fears about Hughey" and that Wainwright took no action to protect Plaintiff. (Doc. 43, pgID 969–70).

Plaintiff addressed one grievance to Wainwright. Plaintiff wrote that she did not want to be in M-Block; her preference was J-Block. In support of her request, Plaintiff relayed similar complaints to those she made to Defendant Ham: that Hughey knew information about Plaintiff, that he talked about murder, and that he made her "extremely uncomfortable."

Plaintiff also testified that she spoke with Wainwright on November 27, 2018. Plaintiff asked her if she was "aware of the fact that my bunky was labeled as a white supremacist." (Doc. 34, at 80:19–81:5).

Plaintiff never told Wainwright that she felt unsafe or that Hughey was violent or threatening toward her. In fact, when Plaintiff appealed Wainwright's response to her grievance, Plaintiff wrote that she felt comfortable in M-Block and that she resolved her differences with Hughey.

That Hughey used to be affiliated with a white supremacist STG, standing alone, is not enough. A reasonable jury could not conclude that Wainwright inferred a substantial risk of serious harm based on nothing more than a label. The evidence shows that Hughey was no longer an active member of the STG and that he had a long history of good behavior prior to the alleged sexual assaults. Plaintiff provides no evidence to the contrary.

Thus, there is no genuine issue of material fact regarding Wainwright's subjective knowledge.

23

### 3.  Qualified Immunity

All Defendants argue that they are likewise entitled to qualified immunity. (Doc. 37, pgID 932–935). To overcome qualified immunity, a plaintiff must show that "(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011).

Because I have concluded that the Defendants did not violate Plaintiff's constitutional rights, I do not reach the "clearly-established" prong. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009) ("The judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case."). Doing so would be superfluous and unnecessary to the full disposition of this dispute.

### <u>Conclusion</u>

Prison officials have the "unenviable task of keeping dangerous [persons] in safe custody under humane conditions[.]" *Farmer*, 511 U.S. at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)). The prison officials here transferred Plaintiff multiple times to try and accommodate her privacy requests and keep her safe. The evidence here does not show that Defendants could have known, let alone actually did know, that Plaintiff was in any serious danger.

It is, therefore,

ORDERED THAT:

1.  Defendants' Motion for Summary Judgment (Doc. 37) be, and the same hereby is, granted.

2. All remaining claims (Doc. 3, Counts I and II) be, and the same hereby are, dismissed
   with prejudice.

SO ORDERED.

*/s/ James G. Carr*
Sr. U.S. District Judge